# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Paul E. Plunkett | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 96 C 5863 | **DATE** | 1/3/2001 |
| **CASE TITLE** | KATHLEEN F. EGEBERGH vs. MICHAEL SHEAHAN, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Cook County is entitled to judgment as a matter of law on all of the claims Plaintiff asserts against it. Cook County's motion for summary judgment is, therefore, granted. Defendants the Village of Mount Prospect, Commander David Nicholson and Officer Joseph Burdi are entitled to judgment as a matter of law on all of Plaintiff's state law claims, but not on the claims brought pursuant to 42 U.S.C. Section 1983. Accordingly, their motion for summary judgment is granted as to the state law claims and is, in all other respects, denied. The Mount Prospect Defendants' motion to strike the Plaintiff's expert report is denied. Plaintiff's claims against the Unknown Cook County Sheriff's Deputies, who Plaintiff has never identified, and Cermak Health Services of Cook County, which is not a suable entity, are dismissed with prejudice. Status hearing set for 1/24/01 at 9:15a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | **Document Number** |
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | 1/4/01 | | |
| ✓ | Docketing to mail notices. | | date docketed | | 128 |
| | Mail AO 450 form. | ⊘ | C.S. | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| TBK | courtroom deputy's initials | 00-7 FILED FOR DOCKETING 01 JAN -3 FH 3:06 | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

**DOCKETED**

JAN 0 4 2001

KATHLEEN F. EGEBERGH, individually )
and as Special Administratrix of )
the Estate of EDWARD J. )
FITZGIBBONS, Deceased, )
                              )
        Plaintiff, )
                              )
    v. )    No. 96 C 5863
                              )    Paul E. Plunkett, Senior Judge
MICHAEL SHEAHAN, as sheriff of )
Cook County, VILLAGE OF MOUNT )
PROSPECT, COMMANDER DAVID )
NICHOLSON, individually and as )
agent of VILLAGE OF MOUNT PROSPECT, )
OFFICER JOSEPH BURDI, individually, )
and as agent of VILLAGE OF MOUNT )
PROSPECT, unknown COOK COUNTY )
SHERIFF'S DEPUTY OR DEPUTIES, COOK )
COUNTY SHERIFF, and, CERMAK HEALTH )
SERVICES OF COOK COUNTY, through )
its agents and employees, and )
COUNTY OF COOK, )
                              )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Before the Court are the summary judgment motions of Defendants Village of Mount

Prospect, Commander David Nicholson and Officer Joseph Burdi ("Mount Prospect Defendants"),

and Michael Sheahan, Cook County Sheriff, Cermak Health Services of Cook County, and County

of Cook, ("Cook County Defendants"), as well as Mount Prospect Defendants' motion to strike the

Plaintiff's expert report. For the reasons provided in this Memorandum Opinion and Order, the

summary judgment motion of the Cook County Defendants is granted. The summary judgment

motion of the Mount Prospect Defendants is granted as to all state law claims, but denied on all

claims brought pursuant to 42 U.S.C. § 1983, and their motion to strike the Plaintiff's expert report is denied.

## The Legal Standard

Federal Rule of Civil Procedure 56(c) allows the Court to grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In considering the evidence submitted by the parties, we do not weigh it or determine the truth of asserted matters. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). All facts must be viewed and all reasonable inferences drawn in the light most favorable to the non-moving party. Transamerica Ins. Co. v. South, 975 F.2d 321, 327 (7th Cir. 1992). "If no reasonable jury could find for the party opposing the motion, it must be granted." Hedberg v. Indiana Bell Tel. Co., Inc., 47 F.3d 928, 931 (7th Cir. 1995) (citing Anderson, 477 U.S. at 248).

## Facts [1]

The following facts are undisputed unless otherwise noted. Officer Joseph Burdi of the Mount Prospect Police Department arrested Plaintiff's decedent, Edward J. Fitzgibbons, on July 21, 1996, based on allegations of shoplifting. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 3.) Fitzgibbons was taken to the Mount Prospect Police Department for processing. (Id. ¶ 8.) Fitzgibbons told Officer Burdi that he had diabetes and Burdi noted this fact on the lockup sheet by writing "diabetic" with two asterisks. (Compare id. ¶ 11 with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 11.) The prisoner lock-up sheet also

---

[1] Be advised that Local Rule 12 was changed to Local Rule 56.1 in September of 1999.

characterized Fitzgibbons' general health as "good." (Defs.' Joint 56.1(a)(3) Stmt. ¶ 12.) The purpose of noting such information in the lockup sheet was to alert lockup personnel about Fitzgibbons' medical condition. (Pl.'s 56.1 (b)(3)(B) Stmt. ¶ 6.) Burdi did not know anything about when and how much insulin Fitzgibbons was required to take to control his diabetes. (Id. ¶ 21.)

During the processing, the Mount Prospect Police Department called Fitzgibbons' sister (the Plaintiff, Kathleen Egebergh) and asked her bring Fitzgibbons' medication to the police station. (Compare Defs.' Joint 56.1(a)(3) Stmt. ¶ 20 with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 20, 21.) Egebergh then went to Fitzgibbons' apartment to get his medication, and she took the one bottle she found in the refrigerator. (Defs.' Joint 56.1(a)(3) Stmt. ¶¶ 22, 23.) According to Dr. Mengal, that one bottle of insulin consisted of regular (short-acting) insulin, a problem since Fitzgibbons was required to take the NPH (long-lasting) insulin in addition to the regular insulin. (Compare id. with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 23, 24.) Because no syringes were on top of the refrigerator, Egebergh took a used syringe that she found on the counter. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 23.) Egebergh placed both the syringe and the one bottle of insulin in a brown paper sandwich bag. (Id.)

Egebergh and her husband then took the bag to the police department. (Id. ¶ 24.) When they arrived Egebergh wrote "Fitzgibbons Keep Refrigerated" on the bag and passed it through a window to a female officer. (Id. ¶ 25.) Once insulin is opened, it should be refrigerated. (Id.) Egebergh informed the officer that Fitzgibbons needed an insulin shot in the morning and in the evening and that he needed to eat three meals a day. (Id. ¶ 26.) Egebergh also informed the officer that Fitzgibbons was fully capable of explaining his medical needs to them if given the opportunity. (Compare id. with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 26.) Commander David Nicholson was the shift supervisor in charge when Fitzgibbons was brought into the station on July 21, 1996. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 28.) He worked from 6:00 a.m. to 4:00 p.m. that day. (Id.) After learning of

Fitzgibbons' condition, Nicholson advised other department supervisors that Fitzgibbons was diabetic and that he would require insulin in the evening. (Id.) Commander Nicholson wrote this information in the daily supervisor's logbook. (Id. ¶ 29.) The logbook is used, among other things, to advise oncoming shifts of needed information. (Id.) The upshot of all of this was that Fitzgibbons was given an insulin shot at 8:20 p.m. on July, 21, 1996, in the lockup. (Id. ¶ 30.)

Sergeant Adamczyk was the supervisor on duty from 2:00 p.m. to 12:00 a.m. on July 21, 1996. (Id.) Adamczyk returned to the station in order to oversee the administration of the insulin. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 31.) Adamczyk called a Mount Prospect paramedic to check the insulin and observe Fitzgibbons administer the insulin to himself. (Id.) Sergeant Adamczyk asked Fitzgibbons when he required his next insulin injection, and he replied that there was no set time as it depended on how he felt and what time he woke up in the morning. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 31.) Adamczyk wrote in the supervisor's logbook that Fitzgibbons was given insulin and that he will need food and insulin the morning of July 22, 1996, prior to the bond hearing. (Compare id. with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 31.)

Commander Nicholson and Officer Burdi returned to work the following morning, July 22, 1996. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 32.) Nicholson learned that Fitzgibbons had received an insulin shot the previous evening after reviewing Sergeant Adamczyk's entry in the supervisor's logbook. (Id. ¶ 33.) Nicholson was also told that Fitzgibbons requested an early breakfast. ( Id.) In addition, because Nicholson had read the supervisor's logbook, he was also aware that Fitzgibbons needed insulin that morning. (Compare id. with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 33.)

Fitzgibbons ate breakfast between 7:00 a.m. and 7:30 a.m. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 33.) While Officer Burdi was preparing to take Fitzgibbons to the bond hearing, Fitzgibbons informed Officer Burdi that he wanted an insulin injection. (Id. ¶ 36.) Fitzgibbons was not given

an insulin injection, and he was sent to Rolling Meadows lockup without his insulin. (Id. ¶ 44.) Commander Nicholson instructed Officer Burdi to contact Egebergh to bring the medication to Rolling Meadows. (Id.) In doing so, Nicholson violated a policy of the Mount Prospect Police Department to transport a detainee's medication with the detainee, if the detainee was transferred to another facility.

Commander Nicholson's decision not to send Fitzgibbons' insulin with him was based on the fact that Fitzgibbons had received insulin the night before and had an early breakfast. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 45.) Commander Nicholson was also concerned that the medication needed to be refrigerated and required the use of a hypodermic needle which probably would not be permitted in the Rolling Meadows lockup facility. (Id.) He also knew that the Rolling Meadows facility was well equipped and had rather elaborate procedures regarding detainees with medical conditions. (Id.) Commander Nicholson also asserts that he believed Fitzgibbons' sister would be at the bond hearing with his insulin. Egebergh asserts such a belief has no basis. (Compare id. ¶ 46 with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 46.) Because Fitzgibbons was charged with a minor offense, Commander Nicholson believed that Fitzgibbons would be detained briefly at Rolling Meadows Courthouse, and that a judge would release him later that same day. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 46.)

Nicholson understood that a diabetic needs periodic injections, but he claims he did not know the seriousness of missing an injection. (Compare Pl.'s 56.1(b)(3)(B) Stmt. ¶ 44 with Mount Prospect Defs.' Resp. Stmt. ¶ 44.) Officer Burdi knew that diabetes deals with insulin and blood sugar levels, but did not know whether it would be hazardous to the health of a diabetic if he did not receive insulin. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 5.)

Officer Burdi transported Fitzgibbons to the Rolling Meadows Courthouse. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 9.) While in the lockup area, Fitzgibbons announced that he was feeling "woozy and shaky." (Compare Defs.' Joint 56.1(a)(3) Stmt. ¶ 54 with Pl.'s 56.1(b)(3)(B) Stmt. ¶ 17.) Officer Burdi observed that Fitzgibbons did not show any signs of discomfort or distress and was sitting calmly. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 56.)

Fitzgibbons was brought before the judge before the other prisoners and at no time during his hearing did Fitzgibbons say that he needed medical attention or that he was in distress. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 56.) After telling the judge he could not post bond, the judge ordered that the prior bond was to stand and Fitzgibbons was remanded to the Cook County jail until his next court date of July 25, 1996. (Id. ¶ 58.) Cook County Sheriff's deputies escorted Fitzgibbons back into the lockup. (Id.)

The Cook County Department of Corrections transported Fitzgibbons from Rolling Meadows Courthouse to Cook County Jail at approximately 12:10 p.m. (Id. ¶ 61.) Fitzgibbons still had had no insulin. Later that day, Fitzgibbons heart stopped. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 199.) In Fitzgibbons's case, ketoacidosis caused cardiac arrest, which caused his death. (Id. ¶ 171.) Fitzgibbons was pronounced dead at 11:08 p.m. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 74.) The primary cause of ketoacidosis in diabetics is the lack of insulin. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 181.)

## Discussion

### The Federal Claims

In Count I, Plaintiff has brought a claim pursuant to 42 U.S.C. § 1983 in which she alleges that Defendants deprived Fitzgibbons of his life without due process of law in violation of his Fourteenth Amendment rights. Plaintiff asserts this claim against all of the Cook County and Mount Prospect Defendants. Count I can be broken into two major issues: (1) whether Plaintiff has asserted a valid § 1983 claim for municipal liability; and (2) whether Plaintiff has asserted a valid § 1983 claim for individual liability.

### Municipal Liability - Cook County

Plaintiff has asserted a § 1983 claim against the County of Cook and Michael Sheahan as Sheriff of Cook County. An official capacity suit is the same as a suit against the entity of which the officer is an agent. <u>DeGenova v. Sheriff of DuPage County</u>, 209 F.3d 973, 974 n.1 (7th Cir. 2000). Therefore, the issue of whether Plaintiff has alleged a valid § 1983 claim against Michael Sheahan as Sheriff of Cook County and/or the County of Cook can be legally and factually analyzed in concert.

To impose § 1983 liability on Cook County, Plaintiff must show that Fitzgibbons was deprived of some constitutionally protected right pursuant to one of Cook County's customs, policies, or practices. <u>Monell v. Department of Soc. Servs.</u>, 436 U.S. 658, 694 (1978). Plaintiff can prove the existence of a custom, policy, or practice by showing that: (1) there is an express policy that, when enforced, causes a constitutional deprivation; (2) there is a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) the constitutional injury was caused

by a person with final policy making authority. <u>Baxter by Baxter v. Vigo County School Corp.</u>, 26 F.3d 728, 735 (7th Cir. 1994).

Plaintiff focuses her claim on the last of those options. She asserts that Sergeant Brennan was the final policy maker concerning Rolling Meadows' lockup procedures and, therefore, his decision not to call the paramedics when Fitzgibbons allegedly felt "woozy and shaky" is imputable to Cook County. In <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 479-80 (1986), the Supreme Court held that a municipality can be held liable under § 1983 for the acts of its final policy makers only if there is: (1) a deliberate choice to follow a course of action; (2) chosen from among various alternatives; and (3) by the official responsible for establishing final policy with respect to the subject matter in question. Plaintiff has not satisfied the last element.

We must look to Illinois law to determine whether Sergeant Brennan had final policy making authority. <u>DeGenova</u>, 209 F.3d at 976. Though the Illinois courts have not addressed this issue directly, our court of appeals, interpreting Illinois law, has held that "Illinois sheriffs have final policy making authority over jail operations." <u>Id.</u> at 976. Sergeant Brennan is not an Illinois Sheriff. Therefore, Plaintiff's assertion that the constitutional injury was caused by a person with final policy making authority fails.

Even if Sergeant Brennan were a person with final policy making authority, his single act would still not constitute policy imputable to the County of Cook. In order for the County of Cook to be liable, Brennan's choice not to call the paramedics must have been a "deliberate" attempt to establish new policy. <u>Vela v. Village of Sauk Village</u>, 218 F.3d 661, 666 (7th Cir. 2000). There is no evidence to suggest that Brennan was deliberately trying to change the policy at the Rolling Meadows Courthouse concerning when paramedics would be called in a medical emergency. In fact, Sergeant Brennan testified in his deposition that if a detainee complained of feeling ill at the Rolling

Meadows Courthouse he would be given medical attention. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 153.) Thus, even assuming Fitzgibbons was having a medical emergency and Brennan chose not to call the paramedics under the circumstances, his actions were not a "deliberate" attempt to establish new policy.

Alternatively, Plaintiff argues that Cook County should be held liable for its failure to train its officers to handle appropriately the medical needs of detainees. In certain circumstances, municipalities can be held liable under § 1983 for failing to train the police officers who are alleged to have committed the constitutional violation. Kitzman-Kelly v. Warner, 203 F.3d 454, 459 (7th Cir. 2000). However, "a finding that the individual officers are liable on the underlying substantive claims" is a prerequisite to a failure to train claim. Tesch v. County of Green Lake, 157 F.3d 465, 477 (7th Cir. 1998). The only Cook County employees named as defendants in Plaintiff's Third Amended Complaint are the Cook County Sheriff, who Plaintiff says she is not suing individually, and "Unknown Cook County Sheriff's Deputy or Deputies," who remain unidentified. Dismissal of unknown defendants is proper "only when it appears that the true identity of the defendant cannot be learned through discovery or the court's intervention." Munz v. Parr, 758 F.2d 1254, 1257 (8th Cir. 1985). Plaintiff has had approximately four years and three amended complaints to identify the unknown defendants. Having failed to do so, the Court dismisses with prejudice the "Unknown Cook County Sheriff's Deputy or Deputies." Because there are no individual Cook County defendants, and there is no evidence in the record to suggest that any non-defendant Cook County employee violated Fitzgibbons' constitutional rights, Plaintiff's § 1983 failure to train claim is dismissed.

<u>Municipal Liability - The Village of Mount Prospect</u>

Plaintiff has also asserted a § 1983 claim against the Village of Mount Prospect. She argues that the municipality is liable because one of its policy makers, Deputy Chief Daley, ratified the wrongful conduct of Commander Nicholson and Officer Burdi. In <u>City of St. Louis v. Pratprotnik</u>, 485 U.S. 112, 127 (1988), the Supreme Court held that "when a subordinate's decision is subject to review by the municipality's authorized policy makers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." The Court also said, however, that "the mere failure to investigate the basis of a subordinate's discretionary decision does not amount to a delegation of policy-making authority." <u>Id.</u> at 130.

Plaintiff asserts that Deputy Chief Daley's ratification is evidenced by: (1) his testimony that no one in his command ever expressed the belief that it was wrong not to transport Fitzgibbons' medication with him (Pl.'s Resp. Defs.' Mots. Summ. J. at 19); and (2) his own belief that Nicholson complied with Mount Prospect procedures in dealing with Fitzgibbons (<u>id.</u>). We disagree. The issue is not whether Daley or his subordinates believed that Nicholson's actions were proper, but whether Daley specifically reviewed and approved of those actions. There is nothing in the record to suggest that he did. Thus, the Village of Mount Prospect cannot be held liable for Nicholson's alleged actions on a ratification theory.[2]

---

[2]Subsequent to the filing of this lawsuit, the Village of Mount Prospect promulgated procedures mandating that when a detainee is transferred to another facility, the detainee's medication is transported with him. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 28.) That action also suggests that the Village did not approve of the actions of Commander Nicholson and Officer Burdi.

While we hold that the Village of Mount Prospect is not liable under a ratification theory, we find that there are genuine issues of material fact as to whether Commander Nicholson was a final policy maker for Mount Prospect with regard to the administration of medication to detainees and the transportation of medication with detainees when they are taken to another facility. The Village of Mount Prospect is liable for Nicholson's actions only if his decisions to withhold insulin from Fitzgibbons and not to transport the insulin with him were (1) deliberate choices to follow a course of action, (2) chosen from among various alternatives, (3) by the official responsible for establishing final policy with respect to the subject matter in question, (4) who was deliberately attempting to establish new policy. Pembaur, 475 U.S. at 479-80; Vela, 218 F.3d at 666.

There are facts to suggest that Commander Nicholson's decision to withhold Fitzgibbons' insulin was deliberate. On the morning of July 22, 1996, Nicholson read the supervisor's logbook, which indicated that Fitzgibbons needed insulin that morning. (Compare Defs.' Joint 56.1(a)(3) Stmt. ¶ 33 with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 33.) In addition, Officer Burdi informed Commander Nicholson that Fitzgibbons requested a shot of insulin before going to the bond hearing. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 36.) While the parties dispute what transpired between Commander Nicholson and Officer Burdi, there is evidence that Commander Nicholson either deliberately refused to give Fitzgibbons his medication or deliberately coerced Fitzgibbons into forgoing his medication so he could attend his bond hearing. (Compare Defs.' Joint 56.1(a)(3) Stmt. ¶¶ 37, 40, 41 with Pl.'s 56.1(b)(3)(A) Stmt. ¶ 37 and Pl.'s 56.1(b)(3)(B) Stmt. ¶ 22.) Thus, Nicholson's decision not to accommodate Fitzgibbons' request for insulin may have been deliberate.

The record also indicates that Commander Nicholson's decision to withhold Fitzgibbons' insulin may have been chosen from among various alternatives. There is evidence that Fitzgibbons could have been given his insulin the morning of July 22, 1996, without missing his bond hearing.

Commander Nicholson instructed Officer Burdi to tell Fitzgibbons that he would miss his bond hearing if Fitzgibbons needed a shot before leaving. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 40.) However, Plaintiff has offered evidence that an insulin injection would take no longer than 15 minutes. (Compare Pl.'s 56.1(b)(3)(B) Stmt. ¶ 37 with Mount Prospect Defs.' Resp. Stmt. ¶ 37.) If that is true, and at this stage we must assume that it is, Fitzgibbons may have been late for his bond hearing if he had taken his insulin shot, but he would not have missed it entirely. (Id.) In short, the record suggests that there were alternatives to Nicholson's decision to withhold Fitzgibbons' insulin.

There are also facts that indicate Nicholson's decision not to transport Fitzgibbons' medication with him was deliberate and was chosen from among various alternatives. At the time of Fitzgibbons' detention, it was the practice of the Mount Prospect Police Department to transport a detainee's medication with the detainee when he was transferred to another facility. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 50.) Nicholson's decision not to send the insulin was a deviation from this unwritten policy, supporting the inference that it was a deliberate choice made from two alternatives.

Defendant contends that Commander Nicholson based his decision not to transport Fitzgibbons' insulin on the fact that he knew Fitzgibbons received insulin the night before, that he had an early breakfast prior to going to the bond hearing as requested, that the insulin needed refrigeration, that a hypodermic needle would probably not be permitted at Rolling Meadows, and that Rolling Meadows was well equipped to deal with detainees with medical conditions. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 45.)

As an initial matter, Nicholson's explanation for his decision supports, rather than negates, the inference that his choice was deliberate. According to Nicholson, he weighed the pros and cons of sending the medication with Fitzgibbons and purposely decided not do so. Moreover, Nicholson's explanation is not supported by the record. Nicholson says he withheld Fitzgibbons' insulin, in part,

because he knew Fitzgibbons had received the medication the day before. But he also knew from the supervisor's logbook that Fitzgibbons needed insulin the following morning. (<u>Compare</u> Defs.' Joint 56.1(a)(3) Stmt. ¶ 33 <u>with</u> Pl.'s 56.1(b)(3)(A) Stmt. ¶ 33.) He also says that he withheld the medication, in part, because he did not believe a hypodermic needle would be allowed at Rolling Meadows. Yet, there is evidence that Rolling Meadows routinely allowed outside police agencies to bring injectable medications into its facility. (Pl.'s 56.1(b)(3)(B) Stmt. ¶¶ 95, 128.) In short, Nicholson's explanation for his decision not to send Fitzgibbons' medication with him, which is itself subject to debate, supports the inference that his choice was deliberate.

There are also genuine issues of material fact as to whether Commander Nicholson is a final policy maker. Commander Nicholson was manager of the Mount Prospect Police Department's accreditation process. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 38.) The accreditation process involves an agency proving compliance with widely accepted and developed national standards, which were developed by several law enforcement organizations and support groups over a long period of time. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 39.) It requires that Commander Nicholson analyze and upgrade all of Mount Prospect's written policies and procedures to ensure that Mount Prospect is addressing the national standards in a professional way. (<u>Id</u>.) It also involves developing proofs of compliance that show evidence of not only the written policies, but adherence to the policies. (<u>Id</u>.) Commander Nicholson coordinated supplemental training to ensure the policies were understood by all Mount Prospect Police Department personnel, and also made documentation available to CALEA, the Commission On Accreditation for Law Enforcement Agencies, for external auditing purposes. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 40.) Nicholson's sole duty as a commander from 1986 through 1988 involved this accreditation process. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 41.) He remained accreditation manager for the rest of his career. (<u>Id</u>.) Nicholson was responsible for reviewing all of the Mount Prospect

Police Department's written policies and procedures, and ensuring compliance with them, from 1986 until the time he left the department. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 42.) Mount Prospect has a written policy regarding prisoners who are prescribed medication. It states: "All medication prescribed by a physician is to be administered as prescribed." (Pl.'s Resp. Defs.' Summ. J. Mots. at 11.) Moreover, Mount Prospect's unwritten policy of transporting medication with prisoners was made a written policy shortly after the incident involving Fitzgibbons. (Pl.'s 56.1(b)(3)(B) Stmt. ¶ 28.) All of this evidence indicates that Commander Nicholson was a final policy maker for the Village of Mount Prospect with respect to the administration of medication to detainees and the transportation of medication with detainees when they are transferred to another facility.

Finally, there is sufficient evidence in the record to support the inference that Nicholson's decisions to withhold insulin from Fitzgibbons and not to transport his medication with him were deliberate attempts to establish new policy. As discussed above, the policy of Mount Prospect was to accommodate a prisoner's request for medication and to transport his medication with him. Commander Nicholson was in charge of making policy for Mount Prospect and ensuring compliance. Therefore, it is reasonable to infer that his deviation from this policy was a deliberate attempt to establish a new policy. Thus, Plaintiff's § 1983 claim against the Village of Mount Prospect survives Mount Prospect Defendants' summary judgment motion. Because the record supports the inference that Commander Nicholson is a final policy maker, we grant Plaintiff leave to amend its Third Amended Complaint to reflect such a claim.


**Individual Liability**

Plaintiff has asserted a § 1983 claim against both Commander Nicholson and Officer Burdi individually for inadequate medical care. To prevail on these claims, Plaintiff must show acts or

omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). There is sufficient evidence in the record to suggest that Nicholson and Burdi's actions rise to the level of deliberate indifference.

The Seventh Circuit dealt with a similar set of facts in <u>Hudson v. McHugh</u>, 148 F.3d 859 (7th Cir. 1998). The plaintiff in Hudson was required to take medication to treat his epilepsy. <u>Id</u>. In his complaint, Hudson alleged that defendants knew about his epilepsy, that he wasn't getting his medication, that defendants did nothing about it and, as a result, plaintiff suffered a seizure. <u>Id</u>. at 864. In reversing the lower court's grant of summary judgment, the Court held that "this is a prototypical case of deliberate indifference." <u>Id</u>.

We find <u>Hudson</u> dispositive. The record in this case indicates that Commander Nicholson and Officer Burdi knew Fitzgibbons was diabetic, he wasn't getting insulin, they did nothing about it and, as a result, Fitzgibbons died. As in <u>Hudson</u>, these facts suggest "a prototypical case of deliberate indifference." <u>Id</u>. Therefore, the Mount Prospect Defendants' summary judgment motion is denied as to the § 1983 claim against Officer Burdi and Commander Nicholson.


## Qualified Immunity

Both sets of defendants have asserted that the government officials involved enjoy qualified immunity from the § 1983 claims asserted by Plaintiff. Government officials performing discretionary functions have qualified immunity from civil damages as long as their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 475 U.S. 800, 818 (1982). The purpose of qualified immunity is to shield public officers from liability resulting from either a change in law after they acted, or enduring legal uncertainty that makes it difficult for the officer to assess the lawfulness of the act in

question before he does it. <u>Ralston v. McGovern</u>, 167 F.3d 1160, 1161 (7th Cir. 1999). In <u>McDonald v. Haskins</u>, 966 F.2d 292 (7th Cir. 1992), the Seventh Circuit held that the guiding principle in qualified immunity determinations is whether "the contours of the [asserted] right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Id.</u> at 293 (<u>quoting</u> <u>Anderson v. Creighton</u>, 483 U.S. 635, 640 (1987). However, "[t]he level of generality at which the relevant legal 'rule' is identified cannot be so abstract as to convert the rule of qualified immunity into a rule of virtually unqualified liability." <u>Id.</u>

Because we granted Cook County Defendants' summary judgment motion on the § 1983 claim, we turn to Mount Prospect's qualified immunity argument. Mount Prospect Defendants correctly assert that it is not enough to address the issue of qualified immunity in this case by merely answering the question "whether the constitutional right at issue-that the defendants were deliberately indifferent to the decedent's medical needs-was clearly established as of [July 1996]." <u>Green v. Carlson</u>, 826 F.2d 647 (7th Cir. 1987). Rather, we must determine whether "the law [was] clear in relation to the specific facts confronting the public official when he acted." <u>McDonald</u>, 966 F.2d 294 (<u>citing</u> <u>Rakovich v. Wade</u>, 850 F.2d 1180, 1209 (7th Cir. 1988) (en banc)).

The facts confronting Commander Nicholson and Officer Burdi were that Fitzgibbons was an insulin-dependent diabetic who needed a shot of insulin on the morning of July 22, 1996. (<u>Compare</u> Defs.' Joint 56.1(a)(3) Stmt. ¶ 33 <u>with</u> Pl.'s 56.1(b)(3)(A) Stmt. ¶ 33; Defs.' Joint 56.1(a)(3) Stmt. ¶ 36.) Yet, neither man made any effort to provide him with his insulin before his bond hearing or to transport his insulin with him to the bond hearing. Defendants cannot seriously argue that their failure to provide essential medication to a detainee in their custody was not clearly

established as a violation of due process in July 1996.[3] <u>Salazar v. City of Chicago</u>, 940 F.2d 233, 237-238 (7th Cir. 1991) (holding that the due process clause prohibits deliberate indifference to the serious medical needs of pretrial detainees). If a jury were to give credence to plaintiff's version of the facts, it could well find that defendants knowingly violated Fitzgibbons' right to due process. Therefore, Mount Prospect Defendants are not entitled to qualified immunity from the § 1983 claim.


## The State Claims

In Counts II-V, Plaintiff has asserted a negligence-special duty-wrongful death and survival claim, and a willful and wanton-wrongful death and survival claim against the Village of Mount Prospect, Commander Nicholson individually, and the County of Cook.[4] Both the Mount Prospect Defendants and the Cook County Defendants assert that they are immune from Plaintiff's state law claims.


## Cook County Defendants

Under Illinois law, "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable." 745 ILL. COMP. STAT. 10/2-109 (West 1992). Because there is no evidence that any Cook County employee committed any tortious act,

---

[3]Nicholson and Burdi claim that they did not know Fitzgibbons' need for insulin was crucial because he told them, when they gave him the choice of taking the insulin and staying in jail or skipping the insulin and going to his bond hearing, that he would be okay without it. (Defs.' Joint 56.1(a)(3) Stmt. ¶ 41.) This argument is unpersuasive. We do not believe that Fitzgibbons' predictable response to this Hobson's choice is sufficient to negate the inference from the other facts in the record that defendants knew Fitzgibbons had a serious need for the insulin.

[4]Because an official capacity suit is the same as a suit against the entity of which the officer is an agent, <u>DeGenova</u>, 209 F.3d at 973, Commander Nicholson as an agent of the Village of Mount Prospect, and Cook County sheriff by and through its agents and employees are unnecessarily named defendants. Furthermore, because Cermak Health Services is subdivision within the County of Cook, it is a nonsuable entity. <u>Jordon v. City of Chicago</u>, 505 F. Supp. 1, 4 (N.D. Ill. 1980).

§ 2-109 renders the County of Cook immune from Plaintiff's state tort claims. Cook County's summary judgment motion on the state law claims is, therefore, granted.

## Mount Prospect Defendants

The Village of Mount Prospect and Commander Nicholson also assert that they have statutory immunity from the state law claims. The statute on which Nicholson relies provides: "Except as otherwise provided by Statute, a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." 745 ILL. COMP. STAT. 10/2-201 (West 1992). According to the Illinois Supreme Court, § 2-201 immunizes the employees to whom it applies for both willful and wanton and negligent acts. In re Chicago Flood Litig., 176 Ill. 2d 179, 195, 680 N.E.2d 265, 273, 223 Ill. Dec. 532, 540 (1997). Thus, if the statue applies to him, Nicholson is entitled to judgment as a matter of law on the state law claims asserted against him.

We agree with defendants that Nicholson's employment with the Village of Mount Prospect involves the determination of policy, the exercise of discretion or both. As discussed above, viewed favorably to plaintiff, the facts establish that Commander Nicholson determined policy for the Village of Mount Prospect. (See supra, at 13.) They also establish that Nicholson exercised discretion in performing his duties. The record indicates, for example, that Nicholson weighed various factors, including Mount Prospect's practice of sending medication with detainees whenever they are transferred, before deciding not to send Fitzgibbons' medication with him to the bond hearing. (Compare Defs.' Joint 56.1(a)(3) Stmt. ¶ 44 with Pl.'s 56.1(b)(3)(B) Stmt. ¶ 50; Defs.' Joint 56.1(a)(3) Stmt. ¶ 45.) As the record, viewed favorably to Plaintiff, demonstrates that

Commander Nicholson's failure to accommodate Fitzgibbons' medical needs was caused by his act or omission in determining policy when acting in the exercise of discretion for the Village of Mount Prospect, he is immune from Plaintiff's state tort claims pursuant to § 2-201.

Because neither Nicholson nor any other Village employee is liable on the state law claims, the Village of Mount Prospect, like Cook County, is also immune from Plaintiff's state law claims by virtue of § 2-109.

## The Motion to Strike Plaintiff's Expert

Mount Prospect Defendants have filed a motion to strike the report of Plaintiff's expert Dennis Waller because: (1) his work experience does not qualify him as an expert in the area of police standards, procedures and practices for medical care of pre-trial detainees; and (2) his report lacks any scientific or reliable methodology and contains legal conclusions.

## Waller's Expertise

Waller is an expert on police procedure. He has approximately seventeen years of law enforcement experience including being a certified police instructor and a diplomat of the American Board of Forensic Examiners and Law Enforcement Experts. (Pl.'s Resp. Defs.' Mot. Strike at 2.) Waller is also a CALEA assessor. (Id.) CALEA, of which Mount Prospect belongs, stands for Commission of Accreditation for Law Enforcement Agencies. (Id.) Part of being a CALEA assessor is knowing which standards are current and applicable to police agencies that are being assessed. (Id. at 3.) To stay current, Waller reads a number of journals, attends seminars and conferences and interacts with people in the field. (Id.) In fact, Waller has previously offered expert testimony on police procedure in the Seventh Circuit. Monfils v. Taylor, 165 F.3d 511, 519 (7th Cir. 1998).

Mount Prospect argues that Waller is not competent to testify because he is not qualified in medicine or the medical care of pre-trial detainees and has "never been accepted by a judge as having expertise in the area of medical needs of a pre-trial detainee." (Defs.' Mot. Strike at 8.) While Mount Prospect is correct that Waller would not be qualified to testify as to his medical opinions regarding this case, his testimony is not offered for that purpose. According to Plaintiff, Waller will testify as to the purpose and importance of procedures. (Pl.'s Resp. Defs.' Mot. Strike at 6.) He will discuss typical police procedures as well as CALEA standards, and he will testify as to proper police response to established medical needs. (Id.) In addition, he will describe what defendants should have and could have done to avoid Fitzgibbons' death. (Id. at 7.) We find that Waller is qualified to testify to such matters. Mount Prospect's concerns with respect to Waller's testimony go to the weight the jury should give his testimony, not to its admissibility. Mount Prospect can address such issues on cross examination and in closing arguments.


Admissibility of the Report

In Daubert v. Merril Dow Pharmaceuticals, Inc., 509 U.S. 579, 581 (1993), the Supreme Court held that the standard for admitting expert testimony is embodied in Federal Rule of Evidence 702, which provides: "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The proponent of the expert testimony bears the burden of establishing the testimony's admissibility by a preponderance of the evidence. Daubert, 509 U.S. at 592.

In essence, Mount Prospect Defendants' argument is that Waller's opinions are not based on any scientific, technical, or other specialized knowledge. (Defs.' Mot. Strike at 10-14.) We

disagree. Waller's methodology consists of evaluating the specific facts of a case in light of the policies in place, using his own knowledge and expertise of law enforcement procedures. (Pl.'s Resp. Defs.' Mot. to Strike at 6-7.) Though Waller's report is not derived from "hard science," his opinions are based on his specialized knowledge of law enforcement procedures. As our court of appeals has acknowledged, "genuine expertise may be based on experience or training." Tyrus v. Urban Search Management, 102 F.3d 256, 263 (7th Cir. 1996). Waller's extensive experience and training endow him with the kind of expertise recognized by the Tyrus court. As such, his testimony is admissible.

Finally, Mount Prospect argues that Waller should not be allowed to testify because his testimony will consist of the ultimate legal conclusion that Commander Nicholson and Officer Burdi were deliberately indifferent to the serious medical needs of Fitzgibbons. (Defs.' Mot. Strike at 15.) Waller will not, however, testify that Defendants were deliberately indifferent. (Pl.'s Resp. Defs.' Mot. Strike at 9.) Rather, he will testify only to the material issues underlying the determination of whether Commander Nicholson and Officer Burdi were deliberately indifferent to the serious medical needs of Fitzgibbons. Accordingly, Waller's testimony is admissible.

### Conclusion

For the reasons stated herein, Cook County is entitled to judgment as a matter of law on all of the claims Plaintiff asserts against it. Cook County's motion for summary judgment is, therefore, granted. Defendants the Village of Mount Prospect, Commander David Nicholson and Officer Joseph Burdi are entitled to judgment as a matter of law on all of Plaintiff's state law claims, but not on the claims brought pursuant to 42 U.S.C. § 1983. Accordingly, their motion for summary judgment is granted as to the state law claims and is, in all other respects, denied. The Mount

Prospect Defendants' motion to strike the Plaintiff's expert report is denied. Plaintiff's claims against the Unknown Cook County Sheriff's Deputies, who Plaintiff has never identified, and Cermak Health Services of Cook County, which is not a suable entity, are dismissed with prejudice.

**ENTER:**

**UNITED STATES DISTRICT JUDGE**

**DATED:** _1-3-01_